BRITTANY L. GARMYN (NY Bar No. 5033287)
COOPER M. REKRUT (DC Bar No. 1044673)
PRO HAC VICE APPLICATIONS PENDING
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C.  20549
Email:  garmynb@sec.gov
Phone: (202) 551-2553 (Garmyn)
Fax: (202) 772-9236 (Garmyn)

LOCAL COUNSEL:
DOUGLAS M. MILLER (Cal. Bar No. 240398)
U.S. Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Email: millerdou@sec.gov
Phone: (323) 965-3837
Fax: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>   vs.<br><br>ENERGY & ENVIRONMENTAL INVESTMENTS, LLC; ENERGY & ENVIRONMENT, INC.; AMIR A. SARDARI; and NARYSA SARDARI LUDDY,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)*] and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. §§ 78u(d), 78u(e), and 78aa*].

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] and Section 27(a) of the Exchange Act [*15 U.S.C. § 78aa*] because certain of the acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendants Amir Sardari and Narysa Luddy reside within the Central District of California, and many victims of the Defendants' fraud reside within this district.

## SUMMARY

4. Defendants Energy & Environmental Investments, LLC ("EEI"), Energy & Environment, Inc. ("E&E"), Amir A. Sardari ("Sardari"), and Narysa Sardari Luddy ("Luddy") perpetrated an offering fraud that raised $9.3 million from over 200 investors nationwide since August 31, 2012.

5. From March 2011 through April 2020, EEI fraudulently offered and sold securities from a call center based in Orange County, California, claiming it would use the money to acquire and develop clean energy projects with an emphasis on the oil and gas sector.

6. In reality, Defendants spent approximately $4.42 million, or 47% of investor funds, on the call center's payroll, marketing, and other expenses, including transferring approximately $1.01 million to Luddy personally, who spent the money on personal expenses. Defendants also used investor funds to pay

1

1   investor returns in a Ponzi-like scheme.

2        7.   As part of its fraudulent offering, EEI staffed a call center with sales

3   agents and required them to cold-call investors using sales scripts that contained

4   false and misleading claims about the success of EEI's business and provided false

5   and misleading projections and valuations of its membership units to investors.

6        8.   Defendants also distributed written materials with false claims,

7   including statements misleadingly advertising the relevant business experience of

8   EEI's managing member E&E, false statements outlining an "exit plan" to conduct

9   an IPO or merger, and continued promises of a second offering even after it was

10  clear that the second offering would not go forward.

11       9.   Defendants further made material omissions by failing to disclose to

12  investors a prior cease-and-desist order for violations of Colorado state securities

13  laws.

14       10.   By this conduct, EEI, E&E, and Luddy violated Sections 17(a)(1), (2),

15  and (3) of the Securities Act [*15 U.S.C. § 77q(a)*] and Section 10(b) of the

16  Exchange Act [*15 U.S.C. §§ 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. §

17  240.10b-5*].

18       11.   By this conduct, Sardari violated Sections 17(a)(1) and (3) of the

19  Securities Act [*15 U.S.C. § 77q(a)(1), (3)*] and Section 10(b) of the Exchange Act

20  [*15 U.S.C. §§ 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*].

21       12.   The Commission seeks findings that Defendants committed these

22  violations; permanent injunctions against each Defendant's future violations of the

23  securities laws; permanent injunctions precluding Sardari and Luddy from

24  participating in an unregistered securities offering; officer-and-director bars against

25  Sardari and Luddy; disgorgement and prejudgment interest from EEI and Luddy;

26  civil monetary penalties from EEI and E&E; and other relief as the Court may

27  deem just and proper.

28

1

**THE DEFENDANTS**

2          13.    **EEI** is a California limited liability company formed on March 14,

3    2011, with a principal place of business in Orange County, California.  EEI is not

4    registered with the SEC in any capacity, and it has not registered any offerings of

5    its securities.  EEI filed a Form D on April 6, 2011.  EEI has been the subject of

6    state securities enforcement actions in Colorado and California.

7          14.    **E&E** registered as a California corporation on May 23, 2001 ("E&E's

8    Registration Date").  E&E is the manager of EEI.  E&E was also the subject of the

9    Colorado and California enforcement actions.

10          15.    **Amir A. Sardari**, age 71, is a resident of Laguna Beach, California.

11   From at least April 6, 2011 through the present, Amir Sardari has been EEI's sole

12   manager, President and CEO, as stated in EEI's Form D and in written

13   communications with EEI investors.  He also has been the President and CEO of

14   E&E from at least April 6, 2011 to the present.  Sardari was also the subject of the

15   Colorado and California enforcement actions.

16          16.    **Narysa Sardari Luddy**, age 38, is a resident of Aliso Viejo,

17   California.  From at least July 2014 through December 2019, she served as EEI's

18   Vice President of Investor Relations, and prior to that time period she served as its

19   Senior Director for Operations.

20

**THE ALLEGATIONS**

21   **A.    EEI's Business**

22          17.    According to EEI's Confidential Private Offering Memorandum

23   ("CPOM"), the company was formed in 2011 "with the purpose of developing or

24   acquiring Clean Energy Solution™ projects, with an emphasis on projects in the oil

25   and gas, manufacturing and commercial building areas."

26          18.    EEI's purported flagship project is a process by which waste oil flare

27   gases are converted to liquefied natural gas that can be used as a substitute for

28   diesel fuel.

3

**B.     EEI's Securities Offering**

19.     Beginning in March 2011, EEI offered and sold investments through a private placement offering reflected in the CPOM.  From August 31, 2012 to April 1, 2020, EEI raised approximately $9.3 million from over 200 investors as part of that offering.

20.     According to EEI's CPOM, EEI was offering 12 million membership units to investors at a price of $1.25 per unit, with the goal of raising $15 million.

21.     The CPOM disclosed that EEI "arbitrarily" set the price of membership units at $1.25, and "[t]he Offering price bears little relationship to the assets, net worth, or any other objective criteria of value applicable to [EEI]." Membership units were expressly illiquid as "[n]o public market exists for the Membership Units and no market is expected to develop."

22.     Under the CPOM, EEI agreed to pay investors returns of "six percent (6%) per annum Preferred Return until the projects are online and an eight percent (8%) per annum Preferred Return thereafter. . . . Until projects are online, the Preferred Return to Non-managing Members shall be funded by the Managing Member, and not from the proceeds obtained through this offering."

23.     From 2011 through at least 2019, EEI also distributed an executive summary of the offering to potential investors, which promised an 8% annual return on investment and projected up to 30% in returns once EEI's projects were operational.

24.     From September 2012 to December 2015, EEI paid investors approximately $986,000 in regular dividends.  Contrary to what was disclosed in the CPOM, these payments were not funded by the managing member (E&E), but instead were paid mostly, if not all, from the proceeds of the offering.

25.     After December 2015, EEI made only sparing dividend payments, totaling approximately $14,000 paid in 2016 and 2017, primarily distributing additional EEI membership units to investors in lieu of cash payments.  In addition

1   to cash and stock dividends, EEI also returned approximately $59,000 in investor
2   principal, which was remitted between October 2014 and May 2017.  Defendants
3   used means and instrumentalities of interstate commerce, such as wire transfers of
4   funds using the ACH system, telephones, and the internet.

### 1. Luddy's Role in the Offering

6   26.   Luddy directly participated in the offer and sale of membership units.

7   27.   As EEI's Vice President of Investor Relations, Luddy maintained an
8   office at EEI's call center and supervised the sales agents.  EEI's bookkeeper listed
9   Luddy as multiple call center employees' "immediate supervisor" on California
10  state unemployment insurance claim forms.

11  28.   According to a former EEI sales agent, Luddy reviewed and approved
12  the sales scripts that callers in the call center would read to potential investors.  Per
13  company policy, she also pre-approved "[a]ny additional documents or articles that
14  need[ed] to be included in the mail-outs or email[s]" that EEI sales agents sent to
15  potential investors.  Luddy was also invoiced for the sales leads.

16  29.   On various occasions, Luddy communicated directly with investors,
17  including by sending letters to investors attaching Schedule K-1 forms, investor
18  update letters, and letters attaching quarterly distributions, and authoring columns
19  in EEI's quarterly newsletters.  Luddy also personally cold-called and solicited at
20  least one elderly investor.  After the initial cold call, Luddy met this investor for
21  lunch and repeatedly called him to ask for more money.  She even suggested that
22  the investor use his IRA account to fund additional investments.

23  30.   From October 2012 until April 2014, Luddy had signatory authority
24  over two EEI bank accounts at JP Morgan Chase.  From July 2014 until December
25  2015, Luddy had signatory authority over two EEI bank accounts at Bank of
26  America.

27  31.   In December 2015, Luddy held herself out as the manager of EEI and
28  opened two additional Bank of America accounts on behalf of the company.

5

32.    From August 2012 through April 2020, Luddy received approximately $1.01 million from EEI investor funds.

### 2.    Sardari's Role in the Offering

33.    Sardari directly participated in the offer and sale of membership units.

34.    In EEI's Form D and in written communications with EEI investors, Sardari described himself as EEI's President and CEO.

35.    In an effort to induce current investors to purchase additional units, Sardari repeatedly announced that EEI would conduct a second offering, which never materialized.  Defendants continued to promise a second offering even after initial efforts to arrange an offering came to an end and no further efforts were being made.

36.    Sardari signed EEI's Form D, filed with the Commission on April 6, 2011.  He also signed subscription agreements with investors on behalf of EEI.

37.    Sardari has had signatory authority over EEI's bank accounts since at least October 2012.

38.    Luddy and Sardari were the only signatories on EEI's bank accounts.

### 3.    E&E's Role in the Offering

39.    E&E directly participated in the offer and sale of membership units.

40.    According to the CPOM, E&E is a "supplier" of "energy and environmental technologies."  The CPOM describes E&E's management of EEI as an "advantage" to EEI and its investing members.

41.    According to the CPOM, E&E is the "Managing Member" of EEI and owned 100% of EEI's "membership units" prior to the securities offering.  Also according to the CPOM, E&E is obligated to fund "Preferred Distributions" to investing members until such time as EEI becomes profitable.

42.    The CPOM explained that Sardari was both E&E's CEO and President and "the person primarily responsible for the management and operations of [EEI]."

43.     E&E was under common ownership with EEI, as Sardari was the principal officer, director, and control person of both entities.

### 4.     EEI's Membership Units are Securities

44.     The EEI membership units are securities in the form of investment contracts.

45.     Investors provided EEI funds in order to invest with EEI through the purchase of membership units and earn the promised returns.

46.     Investors' funds were pooled together in EEI's bank accounts.

47.     The EEI investments were passive, in that the CPOM and other offering materials promised returns based upon the efforts of Defendants.

## C.     Defendants Operated a Call Center to Solicit Investors Using False and Misleading Statements

48.     From approximately March 2011 through April 2020, EEI employed sales agents to solicit investors to purchase EEI membership units.  Operating in a boiler-room type environment, EEI sales agents cold-called prospective investors across the country, based upon purchased lead lists (contact information for purported accredited investors).  EEI divided the cold-callers into "openers" and "closers."  The EEI call center also employed certain high-pressure sales tactics, such as assurances of safety and suggesting to elderly investors that they invest funds from their IRA accounts in EEI.

49.     EEI required its sales agents to adhere to a sales script when cold-calling prospective investors and documented this requirement in its company policies, which sales agents signed as part of their application for employment. The document included the warning: "**Violating any company policies can result in termination without pay!**" (emphasis in original).

50.     A November 2019 version of EEI's sales script stated that "[u]sing our own equipment & patented technology, we capture waste gas in already producing oil wells and convert that waste into LIQUID NATURAL GAS (LNG)

7

to be sold in the open market.  We have been doing this for almost [there is a handwritten change to "over"] 20 years, providing services for companies such as Chevron, Unical [sic], Sempra Energy, just to name a few."

51.     The November 2019 script also stated that "[d]ue to our growth in this sector, [EEI] is offering to the private sector preferred stock at only $1.25 that our financial experts predict could potentially open on the Nasdaq north of $20 per share once we go public. . . . that will equate to a conservative 10-20 x's multiple back to our shareholders."

52.     As further example, in December of 2019 an EEI sales agent sent an investor an email and marketing materials including a statement in the email that "Energy and Environmental Inc. currently has working relationships with major Fortune 500 companies such as Chevron [and] Unical Technology [sic] . . . ." Further, the attached EEI marketing materials listed Chevron and "Unical Technology [sic]" at the top of E&E's "Client Portfolio."

53.     The statements identified in paragraph 50 above were false and misleading because EEI was not selling LNG in the open market in November 2019, let alone doing so for 20 or more years.  In fact, none of EEI's projects has ever been operational, and the company has never generated any revenue from business operations.  EEI also was unable "to find a suitable partner and site to set up a plant with the assets it purchased."  Further still, EEI did not conduct any business with Chevron or Unocal.  EEI and Luddy were makers of these statements.

54.     The statements identified in paragraph 51 above were also false and misleading.  By 2019, EEI had no basis to tell investors that the company would go public and trade on Nasdaq for more than $20 per share.  A decade after EEI launched its private offering, it had no revenue from business operations and its LNG business was still not operational.  Contrary to its representations to investors, EEI had experienced no "growth in this sector."  EEI and Luddy were

1    makers of these statements.

2        55.    The statements identified in paragraph 52 above were also false and

3    misleading.  By 2019, EEI had no basis to tell investors that E&E "currently has

4    working relationships" with Chevron or Unocal.  Contrary to its representations to

5    investors, E&E has had no business relationship with either Chevron or Unocal

6    since at least E&E's Registration Date, other than a single invoice to Western

7    Refining in 2011 for $646.34 worth of materials delivered to Chevron Products Co.

8        56.    Given their senior roles in the company, Sardari and Luddy knew, or

9    were reckless or negligent in not knowing, that EEI had no legitimate business

10   operations or revenue and that E&E had no current or contemporaneous business

11   relationships with Chevron or Unocal.  Sardari and Luddy therefore knew, or were

12   reckless or negligent in not knowing, that each of these misrepresentations was

13   untrue.

14       57.    As the sole officer, director, and control person of EEI and E&E,

15   Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

16       58.    These false and misleading statements regarding EEI's 20-year record

17   of successfully implementing its business plan, EEI's prospects for financial

18   performance, and E&E's business relationships with major energy companies were

19   material to investors.  It would be important to reasonable investors to know that,

20   contrary to these representations, EEI had no legitimate business operations or

21   revenue and E&E had no current or contemporaneous business relationships with

22   Chevron or Unocal.

23   **D.    Defendants Included False and Misleading Statements in Offering**
24   **Documents**

25       59.    Defendants' CPOM, which was distributed to prospective investors

26   identified through cold calls, also included false and misleading material

27   statements.

28

9

60.     In addition to the representations in paragraph 52 above, the CPOM describes E&E's management of EEI as an "advantage" to EEI and its investing members, including because "[E&E] has provided solutions to companies such as Chevron, Unocal, Sempra Energy, Shell Oil, US EPA, Bristol-Myers, General Electric (GE), BAE and many more major companies."

61.     The statements identified in paragraph 60 above were false and misleading because E&E has had no business relationship with either Chevron or Unocal since at least E&E's Registration Date, other than a single invoice to Western Refining in 2011 for $646.34 worth of materials delivered to Chevron Products Co.    All Defendants were makers of these statements.

62.     Given their senior roles in the company, Sardari and Luddy knew, or were reckless or negligent in not knowing, that E&E had no current or contemporaneous business relationships with Chevron or Unocal.  Sardari and Luddy therefore knew, or were reckless or negligent in not knowing, that each of these misrepresentations was untrue.

63.     As the sole officer, director, and control person of EEI and E&E, Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

64.     These false and misleading statements regarding E&E's capacity to provide a business "advantage" to EEI's investors were material to investors.  It would be important to reasonable investors to know that, contrary to these representations, E&E had no current or contemporaneous business relationships with Chevron or Unocal.

E.     **Defendants Made Unreasonable Projections and Other False Statements to Investors**

65.     From 2011 through at least 2019, EEI distributed to investors a one-page executive summary of the private placement offering, which included this statement:  "[e]xit plan is for an Initial Public Offering (IPO) and/or Merger with a large utility energy company, sales or trade of assets (It must be noted that the

sales value of these assets will be 30 to 50% higher that [sic] the acquisition values.).  The target date of performance is within 24 to 36 months."  The executive summary also projected up to 30% in annual returns for investors.

66.    Further, the November 2019 version of the boiler room's sales script stated that: "due to our growth in this section, E&E is offering to the private sector preferred stock at only $1.25 that our financial experts predict could potentially open on the Nasdaq north of $20.00 per share once we go public. . . . that will equate to a conservative 10 – 20 x's multiple back to our shareholders"

67.    In addition, during the period 2013 through 2019, Sardari repeatedly announced to investors that EEI was planning to conduct a new offering at a higher price than the initial offering.  His announcements stated that after the new offering occurred, the value of current investors' membership units would increase by 20%.

68.    Sardari's announcements also contained language that attempted to induce current investors to buy more units, before the new offering commenced, at a purported discount.  Specifically, the announcements stated that EEI "plans to offer all current Members a first right of refusal for increase in membership units until the New PPM has issued."

69.    The statements identified in paragraphs 65 and 66 above were false and misleading in light of EEI's failure to generate any revenue or to set up a liquefied natural gas plant in accordance with its business plan, despite raising millions of dollars from investors for more than a decade.  To represent to investors that EEI had the same "target date" for an "exit plan" for at least an eight-year period was not reasonable under these circumstances.  These representations were also false and misleading—EEI did not conduct an IPO or merger.  Further, EEI also did not have a reasonable basis to continue to tell investors for at least eight years that they could receive up to 30% in annual returns in light of the company's continued failure to generate any legitimate business operations or revenue.  All Defendants were makers of these statements.

70.     Sardari's representations that membership units would increase in value by 20% were also misleading because the company arbitrarily priced its membership units and their offering price was not calculated based on their value.

71.     Given their senior roles in the company, Sardari and Luddy knew, or were reckless or negligent in not knowing, that over the course of at least eight years without any legitimate business operations or revenue, EEI's projected 24-to-36-month exit plan did not have a reasonable basis, nor did its projected investor returns of 30% have a reasonable basis.

72.     Sardari and Luddy further knew, or were reckless or negligent in not knowing, that EEI abandoned its efforts to conduct a second offering in early 2014, yet continued to advertise a second offering to investors until at least 2019.

73.     Sardari and Luddy therefore knew, or were reckless and negligent in not knowing, that each of these misrepresentations was untrue.

74.     As the sole officer, director, and control person of EEI and E&E, Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

75.     These false and misleading statements regarding EEI's exit strategy for investors' illiquid investments were material.  It would be important to reasonable investors to know that (1) EEI was not conducting an IPO or merger within 24 to 36 months, and therefore investors had no hope of extracting value from their illiquid investment; and (2) the company was not conducting a new offering that would increase the value of investors' membership units.

**F.      Defendants Failed to Disclose a Prior Cease-and-Desist Order for Violations of State Securities Laws**

76.     In August 2011, the Securities Commission for the State of Colorado entered a final cease-and-desist order against EEI, E&E, and Sardari prohibiting them from "offering or selling securities in or from Colorado, and from otherwise violating the Colorado Securities Act."

77.   The Securities Commission found that (1) EEI, E&E, and Sardari offered and sold unregistered securities, (2) E&E and Sardari acted as unlicensed broker-dealers or sales representatives, and (3) E&E and Sardari employed or engaged unlicensed sales agents to act as sales representatives in Colorado, all in violation of Colorado law.

78.   The Colorado cease-and-desist order concerned the same EEI securities offering described in paragraphs 19-25 above.

79.   Defendants continued to sell the EEI membership units after entry of the Colorado cease-and-desist order.  Upon information and belief, none of the offering materials provided to prospective investors or the SEC disclosed the Colorado cease-and-desist order, and Defendants failed to properly inform the prospective investors of the cease-and-desist order.

80.   These omissions render misleading several representations in the CPOM and other promotional statements, including touting the "advantage" of EEI's relationship with E&E, "an established and experienced firm" that is a "recognized leader" in environmental technologies—when in fact, a state securities regulator had already issued a cease-and-desist order prohibiting Defendants from conducting the EEI offering within Colorado.

81.   Sardari knew, or was reckless or negligent in not knowing, that the cease-and-desist order was entered against him, EEI, and E&E by the State of Colorado.

82.   As the sole officer, director, and control person of EEI and E&E, Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

83.   A reasonable investor would have considered the existence of a state securities-related cease-and-desist order against EEI, E&E, and Sardari important to know.

## G.    Defendants Misappropriated Investor Funds

84.    EEI's CPOM identified the Use of Proceeds of the offering as follows:  "Proceeds from the sale of Membership Units will be used to develop, implement and/or acquire Clean Energy Solution™ projects.  Proceeds will also be used for start-up expenses, including but not limited to legal, accounting and formation expenses."

85.    In addition, the CPOM stated that investor funds would be applied five percent to "Design and Development," 70 percent to "Project Construction or Acquisition," and 25% to "Operating Expenses."  The CPOM also stated that: "The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interests of the Company and its members in order to address changed circumstances or opportunities."

86.    Instead, Defendants misused investor funds to further their fraudulent scheme and unjustly enrich Luddy.  Specifically, from August 31, 2012 through April 1, 2020, Defendants spent approximately $4.42 million, or 47% of the $9.3 million raised from investors, on the call center's payroll, marketing, and other expenses, including transferring approximately $1.01 million of investor funds to Luddy personally purportedly as salary, expense reimbursement, or other compensation.

87.    From October 2012 until April 2014, Luddy had signatory authority over two EEI accounts at JP Morgan Chase, and from April 2014 until December 2015, Luddy had signatory authority over two EEI accounts at Bank of America. In December 2015, Luddy held herself out as the manager of EEI and opened two additional Bank of America accounts on behalf of the company.

88.    Sardari has also had signatory authority over EEI's bank accounts since at least October 2012.  He and Luddy were the only signatories on the EEI

14

1   accounts.

2        89.    Accordingly, Sardari and Luddy knew, or were reckless in not

3   knowing, that investor funds were not used in accordance with the representations

4   in the CPOM, including that Luddy was misappropriating EEI investor funds for

5   her own personal expenses and other undisclosed purposes.

6        90.    As the sole officer, director, and control person of EEI and E&E,

7   Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

8        91.    The facts set forth above also demonstrate that Luddy failed to

9   exercise reasonable care by, among other things, misappropriating investor funds

10  and thus was negligent.  Sardari similarly failed to exercise reasonable care over

11  EEI's bank accounts, which he controlled, and from which Luddy misappropriated

12  funds over at least a seven-year period.

13       92.    The representations in paragraphs 84 and 85 above were false and

14  misleading.  Defendants led investors to believe their money would be used to

15  acquire and develop clean energy projects.  Instead, Defendants misused investor

16  funds to further their fraudulent scheme, including spending investor money on the

17  call center's payroll, marketing expenses, and transfers to Luddy for personal

18  expenses.  All Defendants were makers of these statements.

19       93.    Defendants' representations about the use of investor funds were

20  material.  A reasonable investor would have considered it important to know that

21  Defendants used investor funds in a manner inconsistent with the representations in

22  the CPOM, including transferring over $1 million to Luddy for personal expenses.

23  **H.    Defendants Made Ponzi-Like Payments to Investors**

24       94.    EEI agreed to pay investors returns of "six percent (6%) per annum

25  Preferred Return until the projects are online and an eight percent (8%) per annum

26  Preferred Return thereafter. . . . Until projects are online, the Preferred Return to

27  Non-managing Members shall be funded by the Managing Member, and not from

28  the proceeds obtained through this offering."

15

95.     Defendants, however, perpetrated a Ponzi-like scheme.  From September 2012 to December 2015, EEI paid investors regular quarterly returns totaling $986,000, even though the company was not generating any revenue to fund these distributions.  As EEI had no other material source of money other than investor funds, the proposed Defendants could not have paid the investor returns without using other investor funds.  These Ponzi-like payments contravened what was disclosed in the CPOM—that investor returns "shall be funded by the Managing Member [E&E], and not from the proceeds obtained through this offering."

96.     The representations in paragraph 94 above were false and misleading. Defendants led investors to believe that their money would be used to acquire and develop clean energy projects and that E&E would fund investor returns.  Instead, Defendants misused investor funds to make Ponzi-like payments back to investors. Given their senior roles at EEI and control over the company's bank accounts, Sardari and Luddy knew, or were reckless or negligent in not knowing, that EEI was not generating sufficient revenues to pay returns to their investors without using other investor funds.  All Defendants were makers of these statements.

97.     In addition, in light of Sardari's role as the sole officer, director, and control person of E&E, he knew, or was reckless or negligent in not knowing, that E&E was not funding the investor returns in accordance with the CPOM.

98.     As the sole officer, director, and control person of EEI and E&E, Sardari's scienter, conduct, and statements are imputed to EEI and E&E.

99.     It would have been important to a reasonable investor to know that instead of E&E funding investor returns, EEI was paying the returns with other investors' money.

# FIRST CLAIM FOR RELIEF

## Fraud in Violation of Section 10(b) and Rule 10b-5 Thereunder

### (*Against All Defendants*)

100.   The Commission realleges and reincorporates paragraphs 1 through 99 as if fully set forth herein.

101.   By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, knowingly or recklessly (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

102.   In connection with the purchase or sale of securities, Defendants made false statements and disseminated offering materials containing additional misstatements concerning EEI's current business operations and future prospects. EEI also failed to disclose to investors a prior cease-and-desist order for violations of Colorado state securities laws.

103.   In addition, Defendants engaged in a scheme to defraud whereby they (1) operated a call center to solicit investors with false and misleading statements and material omissions; (2) misappropriated investor funds for the call center's payroll, marketing, and other expenses, including transferring approximately $1.01 million to Luddy personally, who spent the money on personal expenses; and (3) further misused investor funds to pay Ponzi-like returns to investors.

104.   By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Exchange Act Section 10(b) [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*].

17

**SECOND CLAIM FOR RELIEF**

**Fraud in Violation of Section 17(a)(1) of the Securities Act**

(***Against All Defendants***)

105.   The Commission realleges and reincorporates paragraphs 1 through 99 as if fully set forth herein.

106.   By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly or recklessly employed devices, schemes or artifices to defraud.

107.   In the offer or sale of securities, Defendants engaged in a scheme to defraud whereby they (1) operated a call center to solicit investors with false and misleading statements and material omissions; (2) misappropriated investor funds for the call center's payroll, marketing, and other expenses, including transferring approximately $1.01 million to Luddy personally, who spent the money on personal expenses; and (3) further misused investor funds to pay Ponzi-like returns to investors.

108.   By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Securities Act Section 17(a)(1) [*15 U.S.C. § 77q(a)(1)*].

**THIRD CLAIM FOR RELIEF**

**Fraud in Violation of Section 17(a)(2) of the Securities Act**

(***Against EEI, E&E, and Luddy***)

109.   The Commission realleges and reincorporates paragraphs 1 through 99 as if fully set forth herein.

110.   By engaging in the conduct described above, Defendants EEI, E&E, and Luddy, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly, recklessly, or negligently obtained money or

property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111. In the offer or sale of securities, Defendants made false statements and material omissions and disseminated offering materials containing additional misstatements and material omissions concerning EEI's current business operations and future prospects. EEI also failed to disclose to investors a prior cease-and-desist order for violations of Colorado state securities laws.

112. By reason of the actions alleged herein, Defendants EEI, E&E, and Luddy violated and unless enjoined will continue to violate Securities Act Section 17(a)(2) [*15 U.S.C. § 77q(a)(2)*].

## **FOURTH CLAIM FOR RELIEF**

### **Fraud in Violation of Section 17(a)(3) of the Securities Act**
### (*Against All Defendants*)

113. The Commission realleges and reincorporates paragraphs 1 through 99 as if fully set forth herein.

114. By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

115. In the offer or sale of securities, Defendants engaged in courses of businesses which operated as a fraud or deceit upon the purchasers of securities whereby they (1) operated a call center to solicit investors with false and misleading statements and material omissions; (2) misappropriated investor funds for the call center's payroll, marketing, and other expenses, including transferring approximately $1.01 million to Luddy personally, who spent the money on

19

personal expenses; and (3) further misused investor funds to pay Ponzi-like returns to investors.

116.   By reason of the actions alleged herein, Defendants violated and unless enjoined will continue to violate Securities Act Section 17(a)(3) [*15 U.S.C. § 77q(a)(3)*].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)   finding that Defendants committed the violations of the antifraud provisions of the federal securities laws as alleged herein;

(b)   permanently enjoining each Defendant from violating Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder;

(c)   permanently enjoining Sardari and Luddy from directly or indirectly, including but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts;

(d)   imposing officer-and director bars against Sardari and Luddy pursuant to Section 20(e) of the Securities Act [*15 U.S.C. § 77t(e)*] and Section 21(d)(2) of the Exchange Act [*15 U.S.C. § 78u(d)(2)*];

(e)   ordering EEI and Luddy to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of their illegal conduct pursuant to Section 21(d)(7) of the Exchange Act [*15 U.S.C. §78u(d)(7)*];

(f)   ordering EEI and E&E to pay civil penalties pursuant to Securities Act Section 20(d) [*15 U.S.C. § 77t(d)*] and Exchange Act Section 21(d) [*15 U.S.C. § 78u(d)*];

(g)   retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry

1 out the terms of all orders and decrees that may be entered, or to entertain any

2 suitable application or motion for additional relief within the jurisdiction of this

3 Court; and

4         (h)    granting such other relief to the Commission as the Court may deem

5 just and proper.

6

7 Dated:  February 24, 2023

8                                         */s/ Douglas M. Miller*

9                                         Douglas M. Miller (Local Counsel)

10

11                                         Brittany L. Garmyn

12                                         Cooper M. Rekrut

13                                         Counsel for Plaintiff

14                                         Securities and Exchange Commission

15                                         100 F Street, NE

16                                         Washington, DC 20549

17                                         Phone: (202) 551-2553 (Garmyn)

18                                         Fax: (703) 772-9236 (Garmyn)

                                        Email:  garmynb@sec.gov

**Of Counsel:**

Charles J. Felker (DC Bar No. 426154)

21